UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MINER, LTD.,

      Plaintiff,

v.                                                                Case No. 8:25-cv-1538-KKM-TGW

JOHN DENNIS SANACORE,

      Defendant.

_____

## ORDER

Miner, Ltd., a company in the business of selling, installing, and servicing commercial doors, loading docks, and other products, sues its former executive J. Dennis Sanacore for stealing Miner's trade secrets, breaching the parties' restrictive covenants, and violating his fiduciary duties. *See* Compl. (Doc. 1). Miner moves for a preliminary injunction. Mot. for Prelim. Inj. (PI Mot.) (Doc. 2). Along with the papers, the parties offered testimony at an evidentiary hearing in support of their positions. Because Miner fails to show that it is likely to succeed on any of its claims or that it will be irreparably harmed in the absence of a preliminary injunction, that motion is denied.

## I.   BACKGROUND

Miner sells, installs, and services commercial doors, loading docks, and other equipment related to shipping and warehousing. PI Mot. (Factual Background) (Doc. 2) ¶ 1.[1] Sanacore worked at Miner for years, most recently as a vice president handling national accounts. But in late 2024, their relationship began to sour.

According to Sanacore, two changes caused him to consider leaving Miner. First, Tom Cox, the CEO of Miner's parent company, announced that Sanacore would be moving on from his national-accounts role, despite his success in that position. Second, Sanacore found out that the ownership interest he had in the company had become worthless. On November 2, 2024, Sanacore approached Miner's president, David Wright, about leaving Miner. Wright urged Sanacore not to make a quick decision and scheduled a meeting with the two of them and Cox.

That meeting went poorly. Cox offered Sanacore a less senior role as a salesperson at a related company, reporting to someone that Sanacore did not get along with. Cox also reiterated that Sanacore's ownership interest in Miner was worthless. And on Sanacore's telling, Cox "put his finger in [Sanacore's] face and said

---

[1] Miner's general counsel swears to the Factual Background section of its preliminary injunction motion. *See* PI Mot. at 12.

'if you go to work for a competitor I will effing sue you.' " Sanacore resigned from Miner the next day, without an offer from a new employer.

In the months leading up to his departure from Miner, Sanacore did two things that Miner now objects to. First, Sanacore sent a Miner pricing sheet for Amazon to his personal email account. *See* PI Mot. (Factual Background) ¶ 38; Doc. 2-7); *see also* Sanacore Decl. (Doc. 20-1) ¶ 28. Second, Sanacore downloaded several files from Miner's SharePoint to a device other than his Miner-issued laptop. *See* PI Mot. (Factual Background) ¶ 37; (Doc. 2-6); *see also* Sanacore Decl. ¶¶ 30–32.

After Sanacore told Miner he was leaving, he accepted a job as vice president of sales[2] at Hörmann North America, Inc., a company that manufacturers high-speed commercial doors, loading docks, and other products. PI Mot. (Factual Background) ¶ 30; Sanacore Decl. ¶¶ 10, 19. Unlike Miner, which sells products manufactured by other companies and installs and services them, Hörmann manufactures goods and predominately sells them to dealers and distributors—like Miner—which then sell the goods to end-users. PI Mot. (Factual Background) ¶¶ 30–34; Sanacore Decl. ¶¶ 11–12, 15, 64–65; Ricken Decl. (Doc. 20-2) ¶¶ 3–6

---

[2] Hörmann later promoted Sanacore to executive vice president of sales. Sanacore Decl. ¶ 25.

(declaration of Hörmann's CFO). Several of Sanacore's former Miner colleagues contacted him to congratulate him on his new role, and Miner's president learned of his new position no later than mid-December. *See* Sanacore Decl. ¶¶ 40–41, 44; (Doc. 20-1) at 22, 24. Sanacore also publicly announced his new role on LinkedIn. Not until early March 2025 did Miner send Hörmann and Sanacore demand letters questioning Sanacore's work at Hörmann. Sanacore Decl. ¶ 51; (Doc. 20-2) at 10–11.

Miner filed this action on June 13, 2025, over six months after Sanacore joined Hörmann. Compl. Miner alleges that Sanacore violated the Defend Trade Secrets Act (DTSA), *see id.* ¶¶ 60–67 (Count I), breached his noncompetition and nondisclosure agreements with Miner, *see id.* ¶¶ 68–85 (Counts II & III), and breached his fiduciary duties to Miner, *see id.* ¶¶ 86–91 (Count IV). The same day it sued, Miner moved for an ex parte temporary restraining order and preliminary injunction restraining Sanacore from using Miner's confidential information, requiring Sanacore to return that information to Miner, enjoining Sanacore from working for Hörmann, and restraining Sanacore from soliciting Miner's customers. PI Mot. at 24–25. Later that day, I denied Miner's TRO motion because Miner "fail[ed] to provide 'specific facts in an affidavit or a verified complaint clearly

show[ing] that immediate and irreparable injury, loss, or damage will result to [Miner] before [Sanacore] can be heard in opposition.' " (Doc. 8) at 1 (first alteration added) (quoting FED. R. CIV. P. 65(b)(1)(A)).

I held an evidentiary hearing to consider Miner's evidence in support of a preliminary injunction.

## II.    LEGAL STANDARD

To receive a preliminary injunction, a movant must establish (1) "a substantial likelihood of success on the merits"; (2) "irreparable injury" without an injunction; (3) "the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam); *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## III.  ANALYSIS

Miner fails to show that any of the four factors support issuing a preliminary injunction.

### A. Miner Has Not Shown a Substantial Likelihood of Success on the Merits of Any of Its Claims

Likelihood of success on the merits is "generally the most important" consideration. *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005) (per curiam). "The necessary level or degree of possibility of success on the merits will vary according to the court's assessment of the other factors." *Id.* Miner contends it has shown a likelihood of success on the merits for all four of its claims. PI Mot. at 14–18. Miner is mistaken.

### 1.  Miner Fails to Show That Sanacore Misappropriated a Trade Secret

To start, Miner claims that Sanacore violated the DTSA. PI Mot. at 15; Compl. ¶¶ 60–67. To get relief under the DTSA, a plaintiff must show that (1) it possessed a trade secret—that is, "information deriv[ing] independent economic value . . . from not being generally known . . . and not being readily ascertainable through proper means" that the plaintiff has "taken reasonable measure to keep . . . secret"—and (2) the defendant misappropriated that trade secret. *See* 18 U.S.C.

§§ 1836(b)(1), 1839(3); *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1310–11 & n.13 (11th Cir. 2020); *Trinity Graphic, USA, Inc. v. Tervis Tumbler Co.*, 320 F. Supp. 3d 1285, 1292–93 (M.D. Fla. 2018). A trade secret is "misappropriated" if (1) it is acquired "by a person who knows or has reason to know that the trade secret was acquired by improper means" or (2) it is disclosed or used without consent (subject to conditions not applicable here). 18 U.S.C. § 1839(5).

Even if the documents Sanacore downloaded from Miner's SharePoint and sent to his personal email were indeed trade secrets, Miner fails to show that Sanacore misappropriated them. Miner provides no evidence at all that Sanacore used or disclosed any of the information acquired from Miner other than for official Miner business. Nor does Miner show that Sanacore acquired the information by improper means. An agreement between Sanacore and Miner expressly permitted Sanacore to "remove" Miner's "intellectual property or trade secret" if doing so was "in furtherance of the performance of [his] duties on behalf of" Miner. Restrictive Covenant Agreement (Doc. 2-2) § 5. Miner points to no evidence that Sanacore accessed any of its documents for non-business purposes. While Miner provided evidence that a company policy now prohibits downloading documents from Miner's SharePoint to a location other than a Miner laptop, Miner provides no evidence of

when that policy became effective. Indeed, Miner's witness at the hearing expressly could not recall when Miner implemented that policy, and Sanacore testified that the policy was not in place during the relevant time. Miner therefore fails to show that Sanacore misappropriated any Miner trade secret, and it has not shown that it is likely to succeed on its DTSA claim. *See* 18 U.S.C. 1836(b)(1); *cf. Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1297 (11th Cir. 2018).

### 2.  Miner Fails to Show That Hörmann Competes With Miner

Next, Miner argues that it is likely to succeed on the merits of its claims that Sanacore has breached the parties' non-competition and non-solicitation agreements. PI Mot. at 15–17; Compl. ¶¶ 68–85. The elements of a claim for breach of contract under Florida law are "(1) a valid contract; (2) a material breach; and (3) damages." *People's Tr. Ins. v. Valentin*, 305 So. 3d 324, 326–27 (Fla. 3d DCA 2020) (quoting *Grove Isle Ass'n, Inc. v. Grove Isle Assocs., LLLP*, 137 So. 3d 1081, 1094–95 (Fla. 3d DCA 2014) (per curiam)). Miner contends that Sanacore breached the agreements by "accepting employment at H[ö]rmann, soliciting and servicing Miner's customers, taking Miner's property and using Miner's trade secrets." PI Mot. at 16.

As discussed above, Miner fails to show that Sanacore improperly took any of Miner's property or used its trade secrets under their agreement. *See* Restrictive Covenant Agreement § 5. Miner also failed to produce any evidence that Sanacore solicited or serviced Miner's customers after joining Hörmann.

The focus of Miner's breach argument is instead that Sanacore's work for Hörmann violates his obligation not to work for a competing business. Two general agreements impose that obligation on Sanacore—the Restrictive Covenant Agreement (essentially a rider to his employment agreement), and what the parties call the Annex A agreements,[3] which were executed in connection with Sanacore's ownership interest in Miner.

The Restrictive Covenant Agreement prohibits Sanacore from "participat[ing] in any manner with a Competing Business anywhere in the geographic location in which [Sanacore] provid[ed] services to [Miner]." Restrictive Covenant Agreement § 3(a).[4] In turn, the Agreement defines "Competing Business" as any company or

---

[3] Several Annex A agreements appear in the record, but they all have the same restrictive covenant. *See* (Doc. 2-3) at 6–8, 18–20; (Doc. 2-5) at 3–6.

[4] This provision triggers only for employment at a competing business "(i) where [the job] will require [Sanacore] to provide the same or substantially similar services to a Competing Business as those that [Sanacore] provided to [Miner], or (ii) where [Sanacore]'s competitive employment would risk the disclosure or use of confidential information of

venture "that is directly engaged in whole or in relevant part in any business or enterprise that is the same as, or substantially the same as, the business of [Miner], or that is taking material steps to engage in such business." *Id.* The Annex A agreements prohibit Sanacore from working for any company "whose primary purpose is the operation of any business that competes with" Miner. (Doc. 2-3) at 6, 18; (Doc. 2-5) at 4.[5]

The evidence so far shows that Hörmann does not compete with Miner "in relevant part" or as its "primary purpose." Restrictive Covenant Agreement § 3(a); (Doc. 2-3) at 6, 18; (Doc. 2-5) at 4. Both companies operate in the commercial door,

---

[Miner]." Restrictive Covenant Agreement § 3(a). I assume without deciding that the service Sanacore provides Hörmann is substantially similar to the service that he provided Miner.

[5] The Annex As define Miner's business as

> the business of providing repair service, planned maintenance support, leasing and lease structuring, sales and installation, equipment modernization, diagnostics and analytics services for truck loading dock equipment, commercial doors, recycling/waste handling equipment, material handling equipment, security and access controls solutions, storefront glass systems to customers, and similar equipment and fixtures located at retail, distribution, manufacturing, healthcare and hospitality companies or providing material handling equipment and fleet management and maintenance services, or in any other business activity directly related to the business in which the Company, through its Subsidiaries, is now, or contemplates to be, involved.

(Doc. 2-3) at 7, 18; (Doc. 2-5) at 4.

dock, and warehousing industry, but Miner is a dealer, installer, and servicer, while Hörmann is primarily a manufacturer. Though Hörmann sometimes sells its products directly to end users (that is, Miner's customers), "[t]his is not Hörmann's core business" and direct-to-consumer sales make up less than 5% of Hörmann's annual sales. Ricken Decl. ¶ 9 (emphasis omitted); *see also* Sanacore Decl. ¶ 64 ("I was not aware until very recently that Hörmann did any business directly with end-user customers."). Put another way, a Miner executive estimated that Miner loses ten to twenty bids to Hörmann out of the 48,000 to 60,000 bids that Miner makes every year. Taking the numbers most favorable to Miner, that means that Hörmann beats Miner in less than 0.042% of bids that Miner makes.[6]

Miner provides just one example of a case in which Hörmann competed directly against Miner. A Miner executive explained than Hörmann bid directly on a project in El Paso in May 2025 and sought to hire Miner to install the product, though he did not know whether Hörmann won the contract. But Sanacore explained that the bid was a special request from a Hörmann customer in Mexico

---

[6] Using the less-favorable numbers, it is 0.017%.

and came in through Hörmann's international team. He also said he did not know

of the project until someone at Miner asked him about it.[7]

While Miner and Hörmann sometimes compete directly on some projects

(like the El Paso example), that competition is *de minimis* relative to their businesses.

By and large, Hörmann is a manufacturer, while Miner is—in the words of one of its

current executives—a "middleman." Hörmann overwhelmingly sells to dealers like

Miner, while Miner sells to end users with the goal of servicing those clients'

equipment. For that reason, I conclude that Miner has not shown that Hörmann

competes with Miner "in relevant part" or as its "primary purpose." Restrictive

Covenant Agreement § 3(a); (Doc. 2-3) at 6, 18; (Doc. 2-5) at 4. Miner thus fails to

show that it is likely to succeed on its breach of contract claims.

### 3. Miner Fails to Show That Sanacore Breached a Fiduciary Duty

Finally, Miner contends it is likely to succeed on its claim that Sanacore

breached his fiduciary duties to Miner. PI Mot. at 17–18; Compl. ¶¶ 86–91. "The

elements of a claim for breach of fiduciary duty [under Florida law] are: [1] the

---

[7] At the evidentiary hearing, Miner's counsel explained that Miner "believe[s] that Hörmann is selling to some of [Miner's] more direct traditional horizontal competitors at perhaps better prices to increase Hörmann's margin." Yet he admitted that Miner has no evidence to support that theory now.

existence of a fiduciary duty, and [2] the breach of that duty such that it is the [3] proximate cause of [4] the plaintiff's damages." *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002). While its claim could be more precise, Miner seems to think that Sanacore breached his duties to Miner by (1) "usurping the business opportunities that were available to Miner and by diverting them to" Hörmann,[8] and (2) misappropriating "proprietary information belonging to Miner." PI Mot. at 17–18.

At the preliminary injunction hearing, Miner's counsel conceded that the breach-of-fiduciary-duty count rises or falls with the breach-of-contract counts because it hinges on agreements between Miner and Sanacore. Because I conclude that Miner has failed to show a substantial likelihood of success on those contract counts, I likewise conclude that Miner has not shown a substantial likelihood of success on its breach-of-fiduciary-duty count.

---

[8] In its Complaint, Miner does not allege this first theory of breach. *See* Compl. ¶ 90 ("Sanacore intentionally took actions against Miner's interest with the intent to harm and damage Miner, including, but not limited to, misappropriating Miner's trade secrets and confidential information for the benefit of himself and his new employer while continuing to have ownership interest in MHS, and to the detriment of Miner.").

Accordingly, Miner fails to show a substantial likelihood of success on the merits.

### B. Miner Has Not Shown That It Will Be Irreparably Harmed in the Absence of an Injunction

Next, Miner argues that it will be irreparably harmed in the absence of an injunction. It claims Sanacore is causing harm that cannot be readily compensated, such as loss of goodwill and relationships with clients. PI Mot. at 18–19. Miner also emphasizes that "in cases where there is a breach of a restrictive covenant, like here, the irreparable harm is *presumed*." *Id.* at 19 (emphasis in the original) (citing § 542.335(1)(j), Fla. Stat.). Sanacore responds that Miner unreasonably delayed in seeking a preliminary injunction and it has not shown any impending injury, so it fails this element. Resp. (Doc. 20) at 9–13.

Sanacore is right. While Florida law presumes irreparable injury in restrictive-covenant cases, *see* § 542.335(1)(j), Fla. Stat., that presumption may be rebutted, including by a lengthy delay. *See Blue-Grace Logistics LLC v. Fahey*, 340 F.R.D. 460, 467 (M.D. Fla. 2022) ("The course of this litigation showcases Blue-Grace's delay in seeking a preliminary injunction and rebuts the presumption, fatally undermining its attempt to show imminent irreparable harm." (cleaned up)). "A delay

14

in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). "Indeed, the very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Id.* (emphasis in the original).

Miner's delay here has been significant. Miner knew Sanacore was working for Hörmann no later than December 16, 2024. Sanacore Decl. ¶ 44. Yet Miner did not seek interim relief until June 13, 2025—just shy of six months after learning of Sanacore's new job. *See* PI Mot. "Courts within the Eleventh Circuit have found similar periods—or shorter ones—sufficient delay to defeat an assertion of irreparable harm." *Fahey*, 340 F.R.D. at 468–69 (collecting cases showing that delays of three-to-five months can be fatal). Miner's delay in seeking an injunction belies its claim that it needs immediate interim relief.

Even if Miner's tardiness is insufficient by itself, though, Miner fails to produce evidence that Sanacore is damaging its goodwill, stealing its clients, or otherwise harming its business. Sanacore denies working, while at Hörmann, with any Miner client, and Miner presents no evidence that Sanacore is, or is likely to

begin, stealing its clients. *See* Sanacore Decl. ¶¶ 63–64. Indeed, the substantial differences between Hörmann's and Miner's businesses make such an injury unlikely. More, Sanacore testifies that rather than undermining Miner's business, he protected it on at least one occasion by refusing to provide a quote to one of Miner's direct competitors for a project with Tesla that Miner was pursuing.

Miner fails to show that it will be irreparably harmed absent an injunction.

### C. The Other Two Factors Also Do Not Support Issuance of a Preliminary Injunction

Because Miner has made no real showing of injury, the balance of the equities favors Sanacore. As explained above, Miner has not provided evidence that Sanacore's work at Hörmann is harming it in any way, nor that it is likely to. On the other hand, granting the injunction would, in effect, expel Sanacore from the industry in which he has "spent [his] entire adult career" and cost him a $300,000 salary and six-figure bonus. Sanacore Decl. ¶¶ 3, 20, 25. The balance of the equities thus favors Sanacore. As for the public interest, because Miner has not shown that it is likely to succeed on the merits, the public interest "in the protection and enforcement of contractual rights" and "in protecting legitimate businesses from the disclosure of confidential information" is inapplicable. *Veterinary Orthopedic*

*Implants, Inc. v. Haas*, No. 3:20-CV-868-J-34MCR, 2020 WL 5369087, at *15

(M.D. Fla. Sept. 8, 2020). The public interest does not favor issuance of an injunction,

either.

## IV.   CONCLUSION

Accordingly, Miner fails to show that the four factors support a preliminary

injunction. "Failure to show any of the four factors is fatal." *Am. C.L. Union of Fla.,*

*Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009). Miner's

Motion for Preliminary Injunction (Doc. 2) is therefore **DENIED**.

**ORDERED** in Tampa, Florida, on July 16, 2025.

Kathryn Kimball Mizelle
United States District Judge